**Michael E. Haglund,** OSB No. 772030
Email: mhaglund@hk-law.com
**Christopher Lundberg,** OSB No. 941084
Email: clundberg@hk-law.com
**Shay S. Scott,** OSB No. 934214
Email: sscott@hk-law.com
**HAGLUND KELLEY LLP**
2177 SW Broadway
Portland, OR 97201
Phone: (503) 225-0777
Facsimile: (503) 225-1257

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

(Portland Division)

| | |
|---|---|
| **EVAN WONACOTT**, an individual,<br><br>Plaintiff,<br><br>v.<br><br>**EDWARD MCGRATH**, an individual,<br><br>Defendant. | Case No. 3:23-cv-00499-SI<br><br>**PLAINTIFF'S AMENDED SUR-REPLY IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR FORUM NON CONVENIENS** |

I.    **INTRODUCTION.**

Nothing in Defendant's Reply in Support of Motion to Dismiss for Forum Non

Conveniens ("Def's. Reply") and 238-pages of new evidence meets the standard to justify

dismissing this case. In his Reply materials, defendant provides misinformation in an attempt to

manufacture a conflict and strike the testimony of plaintiff's expert pertaining to Chinese law.

He also fails to present important facts showing that he, himself, and not Mr. Wonacott, acted

purposely to create a delay in filing this action. Mr. Wonacott does not concede there is a statute-

Page 1 – **PLAINTIFF'S AMENDED SUR-REPLY**

of-limitations defense, but defendant's pre-trial foot-dragging undoubtedly served to create an argument in support of one. Defendant also offers to produce the evidence Mr. Wonacott is entitled to now—but only later, and as "necessary," *if* the case is refiled in China, and states he will "waive" any statute-of-limitations defense. But those offers ring hollow.

Further delay creates far more issues prejudicing plaintiff's case than would be avoided by defendant simply waiving a defense and starting over in China. Further, his offer to produce documents in China *later* is belied by the fact that he has already violated the Court's Rule 16 ruling compelling production by continuing to withhold evidence needed to calculate plaintiff's net profits. Defendant has not remotely come close to providing complete information used to calculate net profits. The notion he would suddenly engage in discovery fairly if the case were refiled in China, while noble, is not believable.

Defendant's strategy is twofold: his new evidence and Reply arguments are repetitive efforts to malign Mr. Wonacott's character about issues he never raised until years after freezing plaintiff out of the company. They are baseless, self-serving accusations about exaggerated side-issues defendant was fully aware of at the time but now feigns surprise. Second, despite that the partnership's accounting records are stored in Oregon, the accounting work was performed in Oregon, and the personnel who performed the services continue to reside in Oregon, defendant is *so* disconsolate about having a trial in his home state that he is desperately attempting to conduct a trial within his motion. His Reply materials are a blatant effort to mudsling three years after Mr. Wonacott was ousted from a profitable joint venture that he helped grow and that was grossing over $15 million USD annually when he was forced out, all of which defendant McGrath continues to pocket in Oregon.

Page 2 –  **PLAINTIFF'S AMENDED SUR-REPLY**

Defendant has failed to meet his burden of making "a clear showing of facts which establish such oppression and vexation of a defendant as to be out of proportion to plaintiff's convenience." *Ravelo Monegro v. Rosa*, 211 F.3d 509, 514 (9th Cir. 2000), *cert. denied*, 531 U.S. 1112 (2001). In fact, his arguments do not even acknowledge the applicable legal standard. Defendant's motion should be denied. The Court should modify the remaining pre-trial deadlines, provide plaintiff with an opportunity to compel production in this forum and complete discovery, and set the case for trial.

## II.    ARGUMENT.

### A.    Attorney Chen Does Not Have a Conflict in Providing Testimony.

Defendant and his new Chinese lawyer on Reply, Lu Jiancheng, cite the Law of the People's Republic of China on Lawyers, which *generally* prohibits a lawyer from representing "both parties involved in one and the same case, or acting as agent where there is a conflict of interest" involving "close relatives." Statement of Lu Jiancheng ¶ 2; Supplemental Declaration of David G. Hosenpud ("Supp. Hosenpud Decl.") ¶ 6 & Ex. 6 § 39. Interestingly, defendant's new expert does not conclude that a conflict exists, but in moving to strike the testimony of plaintiff's expert, Chen Xiang Min, defendant McGrath does. Def's. Reply at 9; Supplemental Declaration of Ed McGrath ("Supp. McGrath Decl.") ¶ 2. Defendant, however, fails to cite the ethical rules that apply, which confirm attorney Chen's testimony is proper.

Defendant neglects to cite the "Lawyers' Practice Code of Conduct" adopted by the China Lawyers Association. These rules apply and define prohibited conflicts of interest. Supplemental Declaration of Chen Xiang Min ("Supp. Chen Decl.") ¶ 9. Article 51 prohibits representing "both sides of the case," or "where, after the client relationship has terminated," representing the opposing party "*in the same case.*" *See* Declaration of Shay S. Scott in

**HAGLUND KELLEY LLP**
**ATTORNEYS AT LAW**
**2177 SW Broadway**
**PORTLAND, OR 97201**

Opposition to Defendant's Motion to Dismiss ("Scott Decl.") ¶ 2 & Ex. A at Art. 51(1), (7) (emphases added). The only time a former client must "agree" to a conflict is where a lawyer is retained by the opposing party" in litigation "*they are currently representing someone in*," or where "within one year of terminating representation," the lawyer represents "an opposing party." *Id*. at Art 52(3), (5) (emphasis added).

As explained by attorney Chen, defendant McGrath was never his client. Supp. Chen Decl. ¶ 6. Moreover, nothing in Articles 51 or 52 would create a conflict even assuming for the sake of argument the he *was* a former client. Attorney Chen's testimony concluding that a Chinese court would dismiss this case due to its nature, and even if it did proceed, that Mr. Wonacott would not be entitled to compel the evidence and testimony he needs, is admissible and does not present a conflict. *Id*. ¶¶ 8, 10-14. Defendant's motion to strike should be denied.

**B.    Defendant's Statute of Limitations Argument is Disingenuous.**

Defendant also accuses Mr. Wonacott of intentionally delaying commencing the case in the District of Oregon as a forum-shopping strategy due to the three-year anniversary of Mr. Wonacott parting ways with Mr. McGrath. Def's. Reply at 7. This argument is contrived. First, Mr. Wonacott had no idea defendant would move to dismiss this case and seriously argue it must be refiled in China, instead of being tried in the most obviously convenient forum—where Mr. McGrath lives, works, and where the operations were headquartered. Second, prior to this case being filed, defendant agreed to a tolling agreement including a series of extensions spanning 240 days, which proved futile. Supplemental Declaration of Evan Wonacott in Opposition to Defendant's Motion to Dismiss ("Supp. Wonacott Decl.") ¶ 28.

Mr. Wonacott entered into the tolling agreement in good faith and expected Mr. McGrath would as well. *Id*. Yet, during the entire time the agreement was in place, Mr. McGrath refused

to meet, refused to even discuss scheduling mediation, and refused to engage in any attempt to settle. *Id.*, *See* FRE 408(b) (even actual settlement discussions may be admitted for purposes of "negating a contention of undue delay"). Defendant himself, not Mr. Wonacott, caused the delay in filing this case. Defendant's delay argument is disingenuous.

### C.    Defendant McGrath Represented to the U.S. Military that Nehalem Pacific was 100% U.S. Funded, 100% U.S. Owned, and 100% U.S. Managed.

Defendant claims he was ignorant of the organizational chart sent to Conco, Inc., which unmistakably represented that the joint venture's operations were controlled from Oregon, until after the chart was created and sent. Def's. Reply at 13; Supp. McGrath Decl. ¶ 3 (claiming he never saw it until February 17, 2021). However, a jury could well find defendant's testimony implausible, and that he played a lead role in creating the chart and providing misinformation to gain an advantage in obtaining a procurement contract. This is true for many reasons.

First, Conco, Inc. is a prime contractor that supplies the U.S. Department of Defense. Supp. Wonacott Decl. ¶ 15. Defendant's corporation, Marine Lumber International, Inc., is a secondary sub-contractor. *Id.* Between 2019-2021, defendant was assisting Conco in tendering a military packaging contract to the U.S. Department of Defense on behalf of the joint venture. *Id.* Mr. Wonacott has known defendant since 1983. *Id.* Defendant is a micro-manager, risk averse, and would never delegate to anyone (much less a vendor) the authority to create and send an important document on behalf of his company, particularly with the U.S. military as the target audience, without his prior review and scrutiny. *Id.* Defendant's story that he was unaware of the chart is not believable.

Second, the organization chart boasts that Mr. Wonacott's company in China was "100% U.S. funded, 100% U.S. managed, and 100% U.S. owned." *See* Wonacott Decl., Ex. B (filed

Sept. 8, 2023). When the chart was furnished, Conco was attempting to secure a contract to supply one of the joint venture's products—parts for M548 military specification metal ammunition cans. Supp. Wonacott Decl. ¶¶ 13, 20. During this time, defendant McGrath was fully aware of the requirements to qualify as a supplier using the U.S. procurement platform, "SAM" (System for Award Management). *Id*. ¶ 13. The SAM website, which defendant was intimately familiar with given that military contracts were the joint venture's bread and butter, warns explicitly that misrepresentations about an entity attempting to secure a contract are subject to prosecution under 18 U.S.C. § 1001. *Id*. ¶ 14. It is implausible that defendant McGrath was unaware of the representations as they were being provided to Conco, because they were tendered and intended to be relayed to, and relied on by, the U.S. military. *Id*.

Third, salesperson Henry Turnbull continues to be economically dependent on defendant for munitions packaging sales. Supp. Wonacott Decl. ¶ 16. Mr. Turnbull also claims that defendant McGrath was unaware of the organizational chart until February 17, 2021, but his testimony is demonstrably untrue. During January and February 2021, Mr. Wonacott communicated with Conco's president, Gil Everson on several occasions about the importance of the organizational chart. *Id*. ¶ 17. As part of their communications, Mr. Everson forwarded email correspondence to Mr. Wonacott and identified defendant McGrath as the very party who provided the organizational chart to Conco. *Id*. In one email, Mr. Everson wrote to defendant McGrath complaining about misstatements in the chart and referred to the organizational chart as the "chart *you* provided." *See* Supp. Wonacott Decl. ¶ 17 & Ex. B at 5.

Fourth, in addition to boasting that the China arm of the joint venture was "100% U.S. funded, 100% U.S. managed, and 100% U.S. owned," s*ee* Wonacott Decl., Ex. B, the chart itself contained significant misrepresentations. The chart names "Jiangsu HF Steel Plant" as the metal

**HAGLUND KELLEY LLP**
**ATTORNEYS AT LAW**
**2177 SW Broadway**
**PORTLAND, OR 97201**

can fabricator and identifies Mr. Wonacott as manager of that company. Supp. Wonacott Decl., ¶ 17 & Ex. B at 5. The company was completely made up to deceive by altering the name of an existing company and adding the words "HF," "Steel Plant," and naming Mr. Wonacott as a fictitious manager. *Id*. The company never existed, and Mr. Wonacott never managed it. *Id*.

Fifth, during one of their conversations, Mr. Everson was very upset with defendant McGrath, and Mr. Wonacott learned (1) Mr. Everson had, in fact, discussed the chart with Mr. McGrath; (2) Mr. Everson was upset about being given documents intended for the U.S. military that contained false statements representing that Mr. Wonacott managed metal can fabrications for a company that never existed*;* (3) he was upset defendant McGrath failed to tell Conco that his relationship with Mr. Wonacott had ended; and (4) defendant McGrath failed to correct the misinformation. Supp. Wonacott Decl. ¶ 18.

Sixth, during this same timeframe (before defendant McGrath says he was aware of the representations in the chart), Mr. Everson sent defendant Ed McGrath multiple emails. The correspondence identifies defendant Mr. McGrath as the source of the chart, asks direct questions in an attempt to clear up misinformation (since it had already been included in the proposal to the U.S. military), and alludes to the gravity of the situation as the chart contained false information. Mr. Everson wrote:

- "Ed / Henry, . . . I must have you confirm: 1. <u>Were the 2020 weldments we recently received fabricated by Jiangsu HF Steel Plant? 2. If not, where specifically were they fabricated</u>? . . . If we changed the source of fabrication identified in our proposal without notifying the US government in advance . . . . Please advise ASAP. Gil Everson, President & CEO." Supp. Wonacott Decl. ¶ 19 & Ex. B at 5 (emphasis added).

Page 7 – **PLAINTIFF'S AMENDED SUR-REPLY**

- Ed / Henry, "This revelation presents a major problem! <u>Our entire</u> <u>proposal was based upon the MLI / Nehalem organizational relationship you</u> <u>depicted in the attached chart back in November of 2019</u>. This [was] submitted directly to the government . . . . Changing sources of supply and/or manufacturing processes without advanced notification is prohibited by the contract. . . . I will need you to: 1. Review and validate that the attached organization chart accurately depicted the supply chain as it existed in November 2019. . . ." *Id.* ¶ 19 & Ex. B at 3 (emphasis added).

Seventh, in forwarding the correspondence to Mr. Wonacott, Mr. Everson again confirmed it was defendant Ed McGrath who provided the false information in the organizational chart to begin with. Mr. Everson wrote:

- Evan, I received this yesterday from Ed via Henry: * * * I have contacted the M548 buying activity regarding the situation and am expecting a conference call next week to discuss <u>Ed/MLI's misrepresentations that we included in our</u> <u>proposal</u>. Supp. Wonacott Decl. ¶ 19 & Ex. B at 8 (emphasis added).

Instead of clearing up the misinformation, on February 17, 2021, Mr. McGrath terminated the collaboration with Conco. He ignored Conco's questions and provided an excuse that he was "concerned and put off how strict and regimented this contract will be and . . . we are too busy." Supp. Wonacott Decl. ¶ 22 & Ex. B at 1. This chain of events is significantly different from Mr. Turnbull's testimony, both in terms of the timing of defendant's involvement, and why the relationship with Conco ended. *Compare* Turnbull Decl. ¶¶ 5 ("Mr. Wonacott's disparaging

comments to Conco a year after he departed sunk that opportunity."), 8 (defendant never saw the chart until February 17, 2021, when he decided to end his relationship with Conco).

Defendant and salesperson Turnbull also claim that the reference in the organizational chart admitting Nehalem was "100% U.S. funded," "U.S. owned," and "U.S. managed" really referred to "Evan Wonacott." *See* Turnbull Decl. ¶ 7; Reply at 3, 13. But this "explanation" falls flat in the face of the above-referenced chart that demonstrates Mr. McGrath and Mr. Turnbull's lack of credibility. Mr. Wonacott did not fund the joint venture. Wonacott Decl. ¶ 23 ("Nehalem Pacific had no financial autonomy."). In his own words, defendant "bankrolled it" from Oregon. Supp. McGrath Decl. ¶ 16; *see also id.* ¶ 21 (admitting he "solely funded" Nehalem's bank accounts). If such a strong U.S. connection existed that was clearly worth boasting to the U.S. military about due to Mr. Wonacott's U.S. ties, defendant now taking the opposite position in his motion that the joint venture has "no local interest" at all, with "McGrath's residence" being "the only connection to the District of Oregon," is contradictory. Def's. MTD at 24.

Despite sloppy efforts to insulate himself, an abundance of evidence indicates defendant knew the U.S. military was advised that the joint venture was 100% controlled, managed, and funded from Oregon—exactly as stated in the chart—and that defendant and not Mr. Turnbull provided the false information in identifying the fabricator, and falsely identifying Mr. Wonacott as responsible for managing some fictitious company. Supp. Wonacott Decl. ¶¶ 12-23.

### D. <u>Defendant's Overall Strategy is to Conceal Profitability at All Costs and Should be Rejected.</u>

Defendant's end game is to conceal the accounting evidence Mr. Wonacott needs, and is entitled, to obtain his share of 1/3 net profits and equity in winding up the joint venture.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

Defendant's entire story in support of his motion is largely fabricated and reveals irreconcilable inconsistencies.

First, defendant characterizes Mr. Wonacott as a "vendor," yet oddly he is not named as a vendor along with the other vendors listed in defendant's Accounts Payable records. Supp. Wonacott Decl. ¶ 11.

Second, in hundreds of pages of filings, defendant never attempts to square why he contends Mr. Wonacott was a "vendor," when in his writings, he unmistakably promised Mr. Wonacott would be treated "completely and entirely as an essential partner in this venture," not as an employee, but "working for 1/3 share of the profit, not a salary" with "shared equity" in "[a]nything sold" internationally. *See* Wonacott Decl. ¶ 8 & Ex. A (filed Sept. 8, 2023).

Third, if Mr. Wonacott truly was a "vendor," defendant would not have: (1) separately accounted for partnership expenses in his corporate books and agreed to split profits; (2) "bankrolled" the operation from Oregon; (3) cared where his "vendor" lived; (4) continually replenished his "vendor's" bank accounts from Oregon to keep his "vendor" capitalized; (5) expressed concern if his "vendor" compensated an injured employee; (6) complained if his "vendor" considered going into a noncompeting business with others; and (7) provided his "vendor" with confidential profit-sharing data from Oregon (albeit incomplete).

### 1.    <u>Defendant's effort to malign plaintiff's character is belated and telling</u>.

Nor would defendant have maintained this "vendor" relationship if Mr. Wonacott was so incompetent that defendant now needs to move the case to China so he can call dozens of supposed "witnesses" to malign his character and performance. In reality, defendant would have terminated this "vendor" on-the-spot instead of waiting three years to raise a list of performance-

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
2177 SW Broadway
PORTLAND, OR 97201

related complaints as part of a motion to dismiss. Defendant would have acted affirmatively and sought relief years earlier if his complaints were truly so egregious. Mr. Wonacott categorically denies defendant's accusations maligning his character: they are after-the-fact gripes designed to conceal profits without any accountability.

### 2.    Defendant has violated this Court's order compelling production.

Despite the fact that litigants in China have no substantive right to compel discovery, defendant now offers to produce accounting evidence later on, as "necessary," *if* the case is refiled in China. These are vague, empty promises designed to stonewall producing what Mr. Wonacott is already entitled to now. During the parties' Rule 16 conference on July 18, 2023, the Court ordered defendant to produce "Documents used to determine, account for, calculate, or divide net income." ECF 12 (minutes of Rule 16 proceeding granting Pl's RFP 8). In Reply, defendant submitted 238-pages of never-before disclosed Exhibits in an attempt to portray Mr. Wonacott as a malfeasant, incompetent "arm's length vendor" whose damages, if any, should be offset. Supp. McGrath Decl. ¶¶ 4-6, 9-10, 12, 20-23, 27, 33, 35-39, 41-47 & Exs. 2-18.  This evidence should have been disclosed to plaintiff previously because it is central to defendant's merits argument that Mr. Wonacott's "net income," if any, should be offset.

After the Court granted leave for plaintiff to file a Sur-Reply, defendant filed a "Report" arguing that he did not violate any ruling compelling production. *See* ECF 31 (filed Oct. 20, 2023). In truth, defendant *has* unfairly withheld evidence. He abused the "Attorneys Eyes Only" designation by stamping and producing AEO documents wholesale, making it impossible for Mr. Wonacott to weigh-in on what accounting records continue to be missing. Indeed, defendant's *entire* second batch of production is stamped Attorneys Eyes Only, and his excuse in the Report for not producing the new material is it was not "used" (in the past tense) to calculate net profits.

Page 11 –  **PLAINTIFF'S AMENDED SUR-REPLY**

The term "used," however, in this case is not past-tense. Plaintiff has asserted a claim for wrongful disassociation and seeks damages through trial until the partnership is properly wound up. In context, documents "used" in accounting for profits include those relevant to making calculations and substantiating claimed offsets, not simply documents "used" in prior years.

As explained by Mr. Wonacott in his supplemental declaration, to date, defendant McGrath has refused to provide complete information needed to calculate the net profits he is owed and evaluate the joint venture's value. Defendant has refused to provide reports showing unit sales by product line and failed to provide pricing by product line for 2013 through 2020 and beyond. As a result, it is not possible to view profitability by product line item. The reports consist only of aggregate information. All product line sales and gross costs are mixed together. It is not possible to extrapolate profitability, and even the aggregate reports are inconsistent.

## III.    CONCLUSION.

Defendant's Motion to Dismiss for Forum Non Conveniens should be denied. The Court should modify the remaining pre-trial deadlines, provide plaintiff with an opportunity to compel production and complete discovery, and set the case for trial.

DATED this 7th day of December, 2023.

HAGLUND KELLEY LLP


By: *s/ Christopher Lundberg*
Michael E. Haglund, OSB No. 772030
Christopher Lundberg, OSB No. 941084
Shay S. Scott, OSB No. 934214

Attorneys for Plaintiff


Page 12 – **PLAINTIFF'S AMENDED SUR-REPLY**

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of December, 2023, I served a true copy of the foregoing **PLAINTIFF'S AMENDED SUR-REPLY IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR FORUM NON CONVENIENS** on the following:

David Hosenpud
Lane Powell PC
601 SW 2nd Ave #2100
Portland, OR 97204
hosenpudd@lanepowell.com

Attorney for Defendant

by the following indicated method(s):

☐    by **mailing** a full, true and correct copy thereof in a sealed first-class postage prepaid envelope, addressed to the foregoing attorney at the last known office address of the attorney, and deposited with the United States Post Office at Portland, Oregon on the date set forth above.

☐    by **emailing** a full, true and correct copy thereof to the attorney at the last known email address listed above on the date set forth above.

☐    by sending a full, true and correct copy thereof via **overnight mail** in a sealed, prepaid envelope, addressed to the attorney as shown above on the date set forth above.

☐    by **faxing** a full, true and correct copy thereof to the attorney at the fax number shown above, which is the last-known fax number for the attorney's office on the date set forth above.

☒    by transmitting full, true and correct copies thereof to the attorneys through the court's Cm/ECF system on the date set forth above.

By: *s/ Christopher Lundberg*
Michael E. Haglund**,** OSB No. 772030
Christopher Lundberg, OSB No. 941084
Shay S. Scott**,** OSB No. 934214

Attorneys for Plaintiff

CERTIFICATE OF SERVICE